In the Matter of the Claim of MARION McINTOSH, Respondent, v. E. F. HAUSERMAN Co. et al., Appellants. WORKMEN'S COMPENSATION BOARD, Respondent.

Third Department, March 6, 1961.

*Williams, Williams, Volgenau & Tisdall* (*Paul D. Williams* of counsel), for appellants.

*Lipsitz, Green & Fahringer* for claimant-respondent.

*Louis J. Lefkowitz, Attorney-General* (*John J. Quinn* and *Roy Wiedersum* of counsel), for Workmen's Compensation Board, respondent.

HERLIHY, J. The decedent on April 9, 1954, was 42 years of age and while working as a carpenter and in the act of climbing a ladder received an electric shock and was thrown to the ground. He received multiple injuries including a fractured skull and a subdural hematoma in the frontal and parietal region of the brain which necessitated a craniotomy on April 19, 1954. Thereafter he suffered from loss of speech, headaches, dizziness and convulsions. The convulsive seizures, described as "grand mal", were of such severity that on two occasions fractures of the vertebrae were caused resulting in his wearing a back brace which caused soreness, pain and severe discomfort. He was able to return to part-time work until July, 1956, when his general condition caused him to cease work to which he never returned. During the interim period between the original accident and his death he was taking a variety of medication which included dilantin, pheno-barbital and anticonvulsion medication. He was unable to indulge in intoxicants to the extent he had prior to the accident. Over this period of time he became irritable, suspicious, lost

sexual interest, became discouraged, depressed, demonstrated marked personality changes and his judgment was impaired.

On the day of his death, September 25, 1957, he stopped at a tavern, while his wife waited outside, to have a drink before dinner. When he came out of the tavern he lost his balance and fell, sustaining numerous lacerations which resulted in extensive bleeding.

Appellants contend that while there was a brain injury there was no substantial evidence that decedent suffered from a psychosis or any other form of insanity which caused him to commit suicide. The facts here, they claim, are governed by the rule formulated in *Matter of Delinousha* v. *National Biscuit Co.* (248 N. Y. 93, 96 [1928]): '' Death benefits are allowed if the injury results naturally and unavoidably in disease and the disease causes death. This is so if the injury causes insanity from gangrenous poisoning or otherwise, and the insanity directly causes suicide — in other words, if the suicide is not the result of discouragement, of melancholy, of other sane conditions, but of brain derangement.''

The appellants argue that the evidence here showed a sane condition and no symptoms of brain derangement.

In *Matter of Maricle* v. *Glazier* (283 App. Div. 402, affd. 307 N. Y. 738 [1954]) the decedent, while recovering from a hernia operation, developed certain symptoms — worried, depressed, unable to sleep — which the doctor described as a psychosis which caused him to commit suicide. There was no evidence of any physical injury to the brain. The award was affirmed.

The medical testimony, with which we are here concerned, as to the association of the accident to the subsequent suicide, was in sharp dispute but we think the testimony offered by the claimant was of sufficient probative value to sustain the decision. In a medical report in 1954 it was stated that the neurological examination was normal '' except for minimal narrowing of the left palpebral fissure ''. The medical testimony of both parties was substantially based upon hypothetical questions submitted to psychiatrists, the factual background being given by the physicians who attended decedent. The medical experts for the claimant stated that there was an association between the accident and the suicide based primarily on the fact that before the accident decedent — with the exception of week-end excessive drinking — was a normal person working steadily, living with and supporting his family and not given to depression. After the accident he seemed to be demoralized, depressed and his personality was different than before. He was

irritable, unreasonable and unable to perform his normal duties and accept responsibilities, all of which were indicators of emotional strain.

The medical testimony produced by the appellants was that there was no evidence of any agitated depression or other symptoms associated with psychosis or mental disease. Both doctors admitted that the act of suicide itself was an act of a psychotic. Their testimony was ''I think everybody who suicides is a psychotic '' and '' Obviously this man did become psychotic some time before he shot himself ''.

We think this case differs from any precedent cited, including *Delinousha*, and upon which the dissenters rely. Ordinarily, medical testimony to establish psychosis or mental disease is predicated upon symptoms such as depression, melancholy, change of personality, irrational acts but without any objective evidence of brain damage itself. Here we have a severe and permanent brain injury, the after effects being a deterioration from a normal to an abnormal person. There was medical proof that the symptoms and conditions—aphasia, vertigo, convulsions sufficient to cause fractures of the back and necessitating the wearing of a brace with severe pain and discomfort, irritability, depression, loss of sexual desire, apprehension and discouragement—cumulatively and over a period of three years caused an emotional strain, leaving him feeling helpless and restless.

It should be emphasized that from the time of the accident until death, there was a gradual accumulation and aggravation of all of these conditions finally dramatized by his fall which resulted in extensive bleeding from numerous lacerations and which happened on the evening of his death. This narration of events speaks louder than any medical testimony as to the insidious breakdown of this man's mental and physical capacities. While the word '' insanity '' is lacking in the testimony, that such mental condition did develop is best demonstrated by his actions and definitely supports the statements of the appellants' doctors that he was psychotic at the time of his death. The episode on the evening of his death might well have been the culmination to three abnormal years and paraphrased '' broke the camel's back ''.

The appellants further claim that they were prejudiced by the answer given to a hypothetical question to which they objected as included therein were facts obtained from the decedent's wife, claimant herein, and which facts were considered by the doctors in formulating their opinion. While we do not approve of such procedure, we think the record here

is sufficient to sustain the decision. The widow — claimant — testified at some length concerning her husband's conduct at a hearing in May, 1958. There is in the record dated November, 1958, a report from the doctors in which they refer to conversations with the claimant as being partly responsible for their answers and conclusions and thereafter in January, 1959, the doctors testified and referred to conversations with the claimant. Appellants made no attempt to further examine the claimant as to these conversations with the doctors. It also appears that at the time the appellants made an application for review and argued the matter before the board, no complaint was made or argued as to the validity of the hypothetical questions and not having been contested before the board, it should not now be considered by us on this appeal.

We have here a pattern of events which began formulating immediately following the craniotomy and continued to develop and expand until the date of his death and which formed a basis in fact to substantiate the board's finding that decedent was psychotic at the time of his death.

This is a much stronger case based upon its own facts for a finding of psychosis — brain injury followed by objective symptoms — than the usual case where without any actual knowledge of the brain condition but as the result of objective symptoms a medical conclusion is drawn that there is brain derangement or psychosis.

Decision and award should be affirmed, with costs to the Workmen's Compensation Board.

REYNOLDS, J. (dissenting). Under the rule laid down in *Matter of Delinousha* v. *National Biscuit Co.* (248 N. Y. 93) the injury must cause a disease of the mind or a brain derangement which in turn causes the suicide in order for the suicide to be compensable. It was there pointed out that if the suicide is the result of sane conditions such as discouragement or melancholy the death is not compensable and more recent cases have held that remorse, depression, personality change, and despondency in the absence of testimony indicating a disease or brain derangement are insufficient (cf. *Matter of Palmer* v. *Redman,* 281 App. Div. 723; *Matter of Seal* v. *Effron Fuel Oil Co.,* 284 App. Div. 795; *Matter of Vernum* v. *State Univ. of N. Y.,* 4 A D 2d 722). There is an absence in this record of any medical proof indicating that decedent's injury caused any mental disease or brain derangement and there was therefore insufficient evidence upon which to base an award of death benefits. Decision and award should be reversed and claim remitted.

BERGAN, P. J., and COON, J., concur with HERLIHY, J.; REYNOLDS, J., dissents, in a memorandum, in which GIBSON, J., concurs.

Decision and award affirmed, with costs to the Workmen's Compensation Board.